United States District Court
Southern District of Texas

**ENTERED**

February 26, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GREYSTONE MULTI-FAMILY BUILDERS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-17-921 |
| GEMINI INSURANCE COMPANY, | § § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Plaintiff Greystone Multi-Family Builders, Inc.'s ("Plaintiff") Partial Motion for Summary Judgment (Doc. 16) and Defendant Gemini Insurance Company's ("Defendant") Motion for Summary Judgment (Doc. 17). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART** and Defendant's motion be **GRANTED IN PART AND DENIED IN PART.**

### I.  Case Background

Plaintiff filed this action seeking a declaration that Defendant is obligated to provide a defense in an underlying lawsuit arising out of the alleged breach of a construction contract.[2]

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 6, Ord. Dated June 6, 2017.

[2]    See Doc. 1, Pl.'s Compl.

## A.   <u>The Insurance Policy</u>

TPG (Post Oak) purchased a Project Specific/Owner Controlled Commercial General Liability Insurance Policy from Defendant to cover the period from August 30, 2012, to September 30, 2015.[3]  The Policy covered Plaintiff's construction of the South Post Oak Apartments.[4]  The Policy contained a $2,000,000 limit of liability for each occurrence, as well as a $2,000,000 general aggregate limit and a $2,000,000 products-completed operations aggregate limit.[5]  The Policy included a duty to defend the insured.[6]

### 1.   Duty to Defend

The Policy purchased by TPG contained a duty to defend provision, which stated that:

**SECTION I—COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.   Insuring Agreement**

> **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property

---

[3]    <u>See</u> Doc. 16-3, Ex. C to Pl.'s Mot. for Partial Summ. J., Pl.'s Ins. Policy pp. 1-3, 70, 75-77.  For this exhibit, the court cites to the docket page number rather than the internal document page number.

[4]    <u>See</u> <u>id.</u> p. 45.

[5]    <u>See</u> <u>id.</u> p. 3.

[6]    <u>See</u> <u>id.</u> p. 6.

damage" to which this insurance does not
apply. We may, at our discretion, investigate
any "occurrence" and settle any claim or
"suit" that may result. But:

**(1)** The amount we will pay for damages is
limited as described in Section
III-Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we
have used up the applicable limit of
insurance in the payment of judgments or
settlements under Coverages A or B or
medical expenses under Coverage C.

No other obligation or liability to pay sums
or perform acts or services is covered unless
explicitly provided for under Supplementary
Payments-Coverages A and B.[7]

The Policy stated that the duty to defend only was applicable to

property damage in the following situations:

**b.** This insurance applies to "bodily injury" and
"property damage" only if:

**(1)** The "bodily injury" or "property damage"
is caused by an "occurrence" that takes
place in the "coverage territory";

**(2)** The "bodily injury" or "property damage"
occurs during the policy period, except
for "bodily injury" or "property damage"
included in the products-completed
operations hazard. For "bodily injury"
or "property damage" included in the
"products-completed operation hazard" the
"bodily injury" or "property damage" will
be covered only if it occurs during the
policy period of within the "extended
products-completed operations period; and

**(a)** "Extended products-completed
operations period" means during the

---

[7]    See <u>id.</u>

> period of time allowed by the applicable law, in effect at the inception date of the policy, for claims or suits to be brought against the insured.
>
> **(b)**   The occurrence period described in this endorsement is considered part of the original policy period for purposes of determining the Limits of Insurance. The Products-Completed Operation Aggregate Limit applies for the entire policy period including the "extended Products-Completed operations period."[8]

The Policy defined "occurrence" as "an accident, including continuous or repeated exposure to the same general harmful conditions."[9]

## 2.   Exclusions

In support of its motion for summary judgment, Defendant asserts that even if the duty to defend is triggered by the policy, at least one of the following exclusions applies: j(5), j(6), fungus or spore, or (m).

Defendant contends that the business risk exclusions, j(5) and j(6), apply to this action to exclude coverage:

### j.   **Damage to Property**

> "Property damage" to:
>
> . . .
>
> **(5)**   That particular part of real property on which

---

[8]   See id. pp. 6, 49

[9]   See id. p. 19.

you or any contractors or subcontractors
working directly or indirectly on your behalf
are performing operations, if the "property
damage" arises out of those operations; or

**(6)** That particular part of any property that must
be restored, repaired or replaced because
"your work" was incorrectly performed on it.[10]

. . .

Paragraph (6) of this Exclusion does not apply to
property damage included in the products-completed
operations hazard.

Under the Policy, "products-completed operations hazard" and "your

work" were defined in the following manner:

**16.** "Products-completed operations hazard" is defined as:

**a.** Includes all "bodily injury" and "property
damage" occurring away from premises you own
or rent and arising out of "your product" or
"your work" except:

**(1)** Products that are still in your physical
possession; or

**(2)** Work that has not yet been completed or
abandoned. However, "your work" will be
deemed completed at the earliest of the
following times:

**(a)** When all of the work called for in
your contract has been completed.

**(b)** When all of the work to be done at
the job site has been completed if
your contract calls for work at more
than one job site.

**(c)** When that part of the work done at a
job site has been put to its
intended use by any person or

---

[10]     See id. pp. 9-10.

organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

. . .

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use

6

of "your work", and

**(2)**   The providing of or failure to provide warnings or instructions.[11]

Another exclusion that Defendant points to is the fungus or spore exclusion, added to the Policy via endorsement.  This endorsement defined the exclusion as:

This insurance does not apply to:

**(1)**   "Bodily injury", "property damage", or "personal and advertising injury" caused directly or indirectly, in whole or in part, by:

**a.**   Any "fungus" or "spore," including "fungi" or "spores"; or

**b.**   Any substance, vapor or gas produced by or arising out of any "fungus", "fungi", "spore", or "spores"; or

**c.**   Any material, product, building component, building or structure that contains, harbors, nurtures or acts as a medium for any "fungus", "fungi", "spore" or "spores"; or

**d.**   Actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "fungus" or "spore", including "fungi" or "spores."

Such damage or injury is excluded regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that injury or damage.

. . .

For purpose of this endorsement, the following definitions are added:

---

[11]   See id. pp. 20-21.

7

"Fungus" and/or "fungi" includes, but is not limited to, any form or type of mold, mildew, mushroom, toadstool, smut, or rust.

"Spore" and/or "spores" means any reproductive body produced by or arising out of any "fungus" or "fungi."[12]

Defendant also cites to exclusion (m), which stated:

> **m.  Damage  to  Impaired  Property  or  Property  Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> **(1)**  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> **(2)**  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.[13]

Pertinent to this exclusion, "impaired property" is defined in the

policy as:

> **8.**  "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
>
> **a.**  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> **b.**  You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the

---

[12]   See id. p. 38.

[13]   See id. p. 10.

terms of the contract or agreement.[14]

## B.   The Underlying Lawsuit (the "Underlying Action")

On April 30, 2015, Plaintiff filed the Underlying Action against TPG and Allied, contending that TPG's actions in cancelling the contract resulted in damages.[15]  Plaintiff amended its petition on May 6, 2015, alleging claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, tortious interference, fraud and fraudulent inducement, civil conspiracy, unjust enrichment, and conversion, and sought a declaratory judgment.[16]   On November 11, 2015, TPG filed a counterclaim against Plaintiff, who then sought out its insurer, Defendant, for defense against these counterclaims.[17]  TPG amended its counterclaim on May 10, 2017.[18]

In its first amended counterclaim (the "Counterclaim"), TPG alleges that "[t]his dispute arises from the wholesale failure of [Plaintiff] to properly construct Work under its Construction Contract with [TPG] to build a luxury apartment complex in the

---

[14]   See id. p. 18.

[15]   See Doc. 16-4, Ex. D to Pl.'s Mot. for Partial Summ. J. p. 1.

[16]   See Doc. 1, Pl.'s Compl. p. 6.

[17]   See Doc. 16-1, Ex. A to Pl.'s Mot. for Partial Summ. J., TPG's 1st Am. Ans. & Countercls.

[18]   See Doc. 16-2, Ex. B to Pl.'s Mot. for Partial Summ. J., TPG's 1st Am. Countercl.

Galleria area," which resulted in monetary damages to TPG.[19]   The Counterclaim alleges that TPG and Plaintiff entered into a construction contract, which was later terminated by TPG on April 27, 2015, due to the fact that the project was nine months behind its substantial completion date, far from complete, and over budget.[20]   TPG points to Plaintiff's shoddy construction and management failures as the sources of the problems with the project.[21]

Specifically, TPG alleges construction deficiencies with the project, including the following:

> Omitting thousands of wooden studs and numerous critical beams, posts, clips and joists from the Work that were called for by the Contract Documents, including critical studs necessary to support the five story apartment structure, its required shear walls, trusses, and structural beams.  The omission of these critical structural elements were repeatedly called to [Plaintiff's] attention by structural engineer inspectors, but they went unrepaired for months.  As a result, among other things, the floor of the structure began to sag and critical plumbing elements were cracked and damaged. . . .

> Failure to protect the Work against Hazardous Conditions and water penetration, which caused the Project to become–in the words of [Plaintiff's] CEO–"infested with mold."   This pervasive infestation of hazardous mold, which has since been remediated by [TPG] at a cost of over a million dollars, could and should have been avoided by [Plaintiff]. . . .

> Failure to construct the southern retaining wall as

---

[19]   See id. pp. 2-3.

[20]   See id. pp. 8-9, 15, 27.

[21]   See id. pp. 2-5, 8.

specified in the Contract Documents, causing the
construction of the Project (which included the
excavation of a subterranean garage) to undermine
neighboring properties. As a result, adjacent landowners
initiated legal proceedings and [TPG] was forced to bear
a portion of the costs of resolving the lawsuit. . . .

when first beginning the Project, Greystone Builders
simply "cut" a large nine foot vertical swath of land to
dig into the ground and create an area for the parking
garage rather than supporting the ground around the cut,
causing land subsidence, litigation with adjoining
landowners, and delay and added unscheduled work on the
Project;[22]

TPG also alleges some of the following management problems

with the project:

Specifically, [Plaintiff] managed the Project so as to
incur costs piecemeal, in an ill-fated attempt to create
the appearance that [Plaintiff] could complete the
Project under the agreed budget while hiding the massive
cost overruns [Plaintiff] likely anticipated early into
the Project (if not during even the earliest negotiations
between Eeds and TPG) but did not disclose to TPG. . . .

And for the subcontract work [Plaintiff] did procure, it
"front loaded" payments to subcontractors so as to
realize higher Contractor's Fees, while dis-incentivizing
the respective subcontractors from completing their
respective work on time (and in some cases, at all). Not
surprisingly, the subcontractor failed to complete its
scope of work—which included essential tasks such as
framing the buildings (i.e., building the wood structure
that would support the entire building), installing the
correct gypsum board sheathing (per plan) on the
building's exterior, and installing the Tyvek vapor
barrier system to protect the building structure from
rain and mold as it was constructed—and abandoned the
project, causing added expenditures estimated to exceed
$1 million to complete the work the framing contractor
was paid in full to perform.[23]

---

[22]    See id. pp. 3-4, 26.

[23]    See id. pp. 20-22.

11

Overall, TPG claims that the construction mismanagement caused by Plaintiff on this project have cost it at least $18.9 million to fix and, due to numerous issues with the project, TPG cancelled the contract with Plaintiff.[24]  TPG took over the project, hiring Allied Construction Services to manage it, and the project was nearing completion at the time the Counterclaim was filed in May 2017.[25]

## D.  <u>The History of this Lawsuit</u>

Defendant denied Plaintiff coverage for the counterclaims on March 16, 2016, explaining that it "[was] not obligated to indemnify or defend [Plaintiff] for property damage that occur[ed] while [Plaintiff was] performing operations" and that "property damage caused by mold is precluded under the policy."[26]  Plaintiff asked Defendant to reconsider the denial on April 21, 2016, and, on June 2, 2016, Defendant again denied coverage to Plaintiff, on the ground that Plaintiff never finished the work.[27]  Communications between the parties failed to resolve the dispute.[28]

---

[24]      See <u>id.</u> p. 9.

[25]      See <u>id.</u> pp. 8, 28.

[26]      See Doc. 1-1, Ex. A to Pl.'s Compl., Ltr. from Def. to Pl. Dated Mar. 16, 2016 p. 4.

[27]      See Doc. 1-2, Ex. B to Pl.'s Compl., Ltr. from Pl. to Def. Dated Apr. 21, 2016; Doc. 1-3, Ex. C to Pl.'s Compl., Ltr. from Def. to Pl. Dated June 2, 2016.

[28]      See Doc. 1-4, Ex. D to Pl.'s Compl., Ltr. from Pl. to Def. Dated June 28, 2016; Doc. 1-5, Ex. E to Pl.'s Compl., Ltr. from Def. to Pl. Dated July 1, 2016; Doc. 1-6, Ex. F to Pl.'s Compl., Ltr. from Pl. to Def. Dated July 14, 2016; Doc. 1-7, Ex. G to Pl.'s Compl., Ltr. from Pl. to Def. Dated Aug. 18, 2016; Doc. 1-8, Ex. H to Pl.'s Compl., Ltr. from Pl. to Def. Dated Sept. 15, 2016; Doc. 1-9, Ex. I to Pl.'s Compl., Ltr. from Pl. to Def. Dated Sept. 20, 2016.

Plaintiff filed this action on March 24, 2017, seeking a declaration that Defendant was obligated to defend Plaintiff in the underlying lawsuit.[29] On August 11, 2017, Plaintiff filed its pending motion for partial summary judgment.[30] Defendant filed its pending motion for summary judgment on August 18, 2017.[31] Both parties have filed responses and replies to each pending motion.[32] The pending motions only address Defendant's duty to defend; the duty to indemnify will be addressed by the court at a later date.

## II.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists on any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence

---

[29]   See Doc. 1, Pl.'s Compl.

[30]   See Doc. 16, Pl.'s Mot. for Partial Summ. J.

[31]   See Doc. 17, Def.'s Mot. for Summ. J.

[32]   See Doc. 27, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J.; Doc. 30, Pl.'s Reply in Support of its Mot. for Partial Summ. J.; Doc. 31, Pl.'s Resp. to Def.'s Mot. for Summ. J.; Doc. 32, Def.'s Reply in Support of its Mot. for Summ. J.

such that a reasonable jury could resolve the issue in favor of either party. See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

Cross-motions for summary judgment are considered separately under this rubric. See Shaw Constructors v. ICF Kaiser Eng'rs, 395 F.3d 533, 538-39 (5th Cir. 2004). Each movant must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law, and the court views the evidence in favor of each nonmovant. See id.; Tidewater Inc. v. United States, 565 F.3d 299, 302 (5th Cir. 2009)(quoting Ford Motor Co. v. Tex. Dep't of Transp., 264 F.3d 493, 499 (5th Cir. 2001)).

### III. Analysis

#### A. Insurance Law

Under Texas law, the insured generally bears the initial burden of establishing that coverage is potentially provided by the applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage. See SWE Homes, LP v. Wellington Ins. Co., 436 S.W.3d 86, 90 (Tex. App.—Houston [14th Dist.] 2014, no pet.). If the insurer is successful, the burden shifts back to the insured to prove that an exception to the exclusion applies. Guar. Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir. 1998).

##### 1. Contract Interpretation

Insurance policies are subject to the rules of contract interpretation. State Farm Lloyds v. Page, 315 S.W.3d 525, 527 (Tex. 2010). In construing the terms of a written contract, the court's primary goal is always "to determine the contracting parties' intent through the policy's written language." Id. To this end, the court reads all parts of the contract as a whole and gives effect to each word, clause, and sentence so that no part of the agreement is rendered inoperative. Id. Courts construe terms in contracts to have their plain, ordinary meaning unless something in the contract itself indicates that the parties intended for them to have particular definitions. Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 831 (Tex. 2009).

When a contract as worded can be given "a definite or certain legal meaning," then it is unambiguous as a matter of law, and the court enforces it as written. WBCMT 2007 C33 OFFICE 9720, L.L.C. v. NNN Realty Advisors, Inc., 844 F.3d 473, 478 (5th Cir. 2016)(applying Texas law). The court will not find an insurance contract ambiguous because it lacks clarity or because the parties disagree on its meaning. Id.; Page, 315 S.W.3d at 527. "Instead, a contract is ambiguous 'only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction.'" WBCMT 2007 C33 OFFICE 9720, L.L.C. , 844 F.3d at 478 (quoting McLane Foodservice, Inc. v. Table Rock Rests., L.L.C., 736 F.3d 375, 378 (5th Cir. 2013)).

### 2.  Duty to Defend

In Texas, an insurer's duty to defend and its duty to indemnify are two distinct and separate duties.  <u>McGinnes Indus. Maint. Corp. v. Phoenix Ins. Co.</u>, 477 S.W.3d 786, 803 (Tex. 2015). In determining whether an insurer has a duty to defend, courts follow the eight-corners rule.  <u>Ewing Const. Co., Inc. v. Amerisure Ins. Co.</u>, 420 S.W.3d 30, 33 (Tex. 2014).  "Under that rule, courts look to the facts alleged within the four corners of the pleadings, measure them against the language within the four corners of the insurance policy, and determine if the facts alleged present a matter that could potentially be covered by the insurance policy." <u>Id.</u>  The court examines the factual allegations that give rise to the damages claims, not the legal conclusions or theories asserted. <u>Id.</u>  Doubts about the duty to defend are resolved in favor of the insured.  <u>Id.</u>

"Facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination . . . ."  <u>Liberty Mut. Ins. Co. v. Graham</u>, 473 F.3d 596, 600 (5th Cir. 2006)(applying Texas law).  The Texas Supreme Court, in dicta, favorably cited a Fifth Circuit Court of Appeals decision in which the federal court predicted that Texas' highest court would recognize an exception to the eight-corners rule only "when it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage

16

which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." <u>GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church</u>, 197 S.W.3d 305, 308-09 (Tex. 2006)(quoting <u>Northfield Ins. Co. v. Loving Home Care, Inc.</u>, 363 F.3d 523, 531 (5th Cir. 2004)).

**B.  Discussion**

Plaintiff contends that Defendant has the duty to defend against TPG's counterclaims in the underlying lawsuit.  Defendant disagrees, and argues that even if it has the duty to defend, at least one of several different exclusions applies.

**1.  "Occurrence"**

Plaintiff argues that the Policy covers this case because the events of this case fall under the definitions of property damage and occurrence, and the policy covers property damage caused by an occurrence.  Defendant argues that the counterclaims do not allege an occurrence, as occurrence is defined as an "accident" and the allegations contain no such "accident."

In <u>Lamar Homes, Inc. v. Mid-Continent Casualty Co.</u>, 242 S.W.3d 1, 4-5, 7 (Tex. 2007), the Texas Supreme Court held that allegations of unintended construction defects or faulty workmanship that injure only the work of the insured may constitute an 'occurrence' under a CGL policy.  The relevant insurance policy defined "occurrence" as "an accident, including continuous or

17

repeated exposure to substantially the same general harmful conditions." Id. at 6.

The court noted that the policy did not define "accident" but concluded that the ordinary meaning encompassed a deliberate act, performed negligently, such that the result was not intended and would have been different given correct performance. Id. at 8. "Thus, a claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury . . . or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not." Id. at 9.[33] To determine whether faulty workmanship was accidental, the court looked to the underlying allegations. See id. The court also cautioned it is a "false assumption" that "fail[ing] to

---

[33]    In its motion, Defendant cites to this test from Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp. ("Puget II"), 735 F. Supp.2d 650, 654 (S.D. Tex. 2010),

> deliberate acts may constitute an accident unless: (1) the resulting damage was "highly probable" because it was "the natural and expected result of the insured's actions," (2) "the insured intended the injury," or (3) the insured's acts constitute an intentional tort, in which case, the insured is presumed to have intended the injury. In sum, [Puget] cannot recover under the Policy if: (1) the injury to Microtherm was highly probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort.

In that case, this quote was from Nat'l Union Fire Ins. Co. v. Puget Plastics ("Puget I"), 532 F.3d 398, 401-02 (5th Cir. 2008), and the court in Puget I was quoting Lamar Homes for this iteration of the test. The court agrees with Defendant that the injury does not have to be intentional on the part of Plaintiff, as Lamar Homes states that it can be "highly probable" because it was the "natural and expected result of the insured's actions." However, the court does not see how this changes anything that was explained in Lamar Homes, as the test quoted above is from Lamar Homes. Plaintiff does not dispute that this is part of the test.

perform under a contract is always intentional," instead stating that the foreseeability is a factual determination. Id. at 8. The court concluded, "at bottom, an occurrence is simply an unexpected consequence of an insured's act, even if due to negligence or faulty work." Id. (internal quotations and citations omitted).

The policy before this court contains an almost identical definition for "occurrence." Defendant contends that the allegations in the counterclaim demonstrate that Plaintiff's actions were not an accident or occurrence. Specifically, Defendant points to statements in the counterclaim, including: (1) Plaintiff was able to hide costs to allow it to continue to collect its contractor's fee; (2) Plaintiff paid subcontractors up front so that it could collect higher contractor's fees, which resulted in lower incentives for the subcontractors to complete their work, which "[n]ot surprisingly" resulted in work going unfinished; (3) Plaintiff withheld information from TPG; (4) and that, due to these issues, the workmanship was predictably poor.[34] Plaintiff argues that the allegations in the Counterclaim do not demonstrate that it acted intentionally, as they merely show errors, mistakes, and defects made by Plaintiff.

Looking to the allegations in the underlying counterclaim, the court finds no allegation that Plaintiff intended its work to cause

---

[34]    See Doc. 17, Def.'s Mot. for Summ. J. pp. 11-13 (citing Doc. 16-1, Ex. A to Pl.'s Mot. for Partial Summ. J., Counterclaim; Doc. 16-2, Ex. B to Pl.'s Mot. for Partial Summ. J., Am. Counterclaim.

the damage or that it was the natural and expected result of Plaintiff's actions.  It is not clear that because Plaintiff paid its subcontractors up front, Plaintiff intended the result to be shoddy workmanship.  In <u>Lamar Homes</u>, the court explained that "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly."  242 S.W.3d at 8; <u>see also</u> <u>Puget II</u>, 835 F. Supp.2d at 662 ("[i]f, however, the damage occurred only as a result of the poor performance of the intentional act, then there was an accident.").  The court agrees with Plaintiff that the allegations of up-front payments to contractors was a management failure, not intentional conduct to cause poor construction of the project.  The argumentative statements in the counterclaim that it was "not surprising" that the work was mediocre due to the timing of payments are not sufficient to demonstrate that Plaintiff's conduct was intentional or that the shoddy work was highly probable and the natural and expected result of its actions.  Therefore, the court finds that there are allegations that fall under the definition of an "occurrence."

### 2. Property Damage

The "property damage" portion of <u>Lamar Homes, Inc.</u> also focused on the policy definition of the term, which was "[p]hysical injury to tangible property, including all resulting loss of use of

that property." <u>Lamar Homes, Inc.</u>, 242 S.W.3d at 10.   There, the issue concerned whether "physical injury" could encompass defective workmanship that caused sheetrock and a stone veneer to crack.   <u>See</u> <u>id.</u>   The court disagreed with the trial court's holding that physical injury to the homebuilder's own work cannot be property damage.   <u>Id.</u>   Although the court acknowledged that repair or replacement of the insured's own defective work is often not covered by CGL policies, the court stated that the reason was not because faulty workmanship can never fit within the definition of "property damage" but because the specific act or damage did not otherwise fit within coverage language or fits within an exclusion. <u>See</u> <u>id.</u>

In this case, coverage was afforded for "[p]hysical injury to tangible property" including loss of use and "[l]oss of use of tangible property that is not physically injured."[35]   Defendant does not dispute that there was some property damage in this case, but argues that "[m]ost of the complaints are of increased costs of construction due to duplication of effort, purchasing gaps, use of wrong materials, deviations from plans and specifications, code violations, delays, technical violations of the Construction Contract, and liquidated damages."[36]   Defendant also contends that there was no loss of use caused by the property damage because

---

[35]    <u>See</u> Doc. 16-3, Ex. C to Pl.'s Mot. for Partial Summ. J., Plaintiff's Ins. Policy p. 20.

[36]    Doc. 17, Def.'s Mot. for Summ. J. p. 15.

"there is no allegation that [TPG] ever had any intention of actually operating the apartment complex."[37]   Plaintiff argues that there are allegations that fall under the definition of property damage.

Looking at the Counterclaim, the court agrees that there are allegations that Plaintiff's shoddy work caused property damage. For example, TPG alleges that because Plaintiff omitted certain structural elements from the project "the floor of the structure began to sag and critical plumbing elements were cracked and damaged."[38]   TPG also alleges that "[t]he Project's framing subcontractor . . . conducted its work so as to create a virtual 'greenhouse' for mold growth."[39]  TPG alleges that because Plaintiff did not properly oversee the roof installation, this "resulted in many incorrect assemblies and water leaks."[40]   While the court acknowledges Defendant's argument that most of the allegations have to do with violations of the construction contract, there are allegations that clearly fall under the definition of property damage.

Defendant argues that there was no loss of use because there is no allegation that TPG intended to operate the apartments.  This

---

[37]    Id.

[38]    Doc. 16-2, Ex. B to Pl.'s Mot. for Partial Summ. J., TPG's 1st Am. Countercl. p. 3.

[39]    See id. p. 24.

[40]    See id. p. 25.

argument is misplaced.  The numerous construction problems delayed
the project long after it was supposed to be finished, as alleged
by TPG, and TPG fired Plaintiff and worked to fix the problems with
the project so it could be completed.  From the allegations in the
Counterclaim, it is clear that TPG intends to finish the project
and lease the apartments.  The court disagrees with Defendant on
this point.[41]

### 3.  Exclusions

Finding that the Counterclaim alleged an occurrence causing
property damage, the court turns to the question of whether any of
the exclusions bar coverage.  Defendant contends that either j(5),
j(6), (m), or the fungus spore exclusion apply to exclude coverage
in this case.  Plaintiff asserts that none of these exclusions are
applicable.

### a.  Exclusion j(5)

---

[41]     Additionally, Plaintiff contends in a response that there was also
property damage to the surrounding landowners, which it argues constitutes an
occurrence.  Plaintiff cites allegations stating that land subsidence was caused
by Plaintiff's cutting into the land without supporting it and that Plaintiff's
excavation of the garage "undermine[d] neighboring properties."  Doc. 16-2, Ex.
B to Pl.'s Mot. for Partial Summ. J., TPG's 1st Am. Countercl. pp. 3-4, 22.
Defendant argues that this does not show property damage to third-party property.
However, the Counterclaim unequivocally states that neighboring properties were
undermined by Plaintiff's work on the property.  Courts have held that damage to
third-party property constitutes an accident or occurrence.  Federated Mut. Ins.
Co. v. Grapevine Excavation Inc., 197 F.3d 720, 725 (5th Cir. 1999)("courts have
consistently held that damage wreaked on the work product of a third party-as
opposed to that of the insured-is presumed to have been unexpected and,
therefore, constitutes an accident or occurrence.").  Additionally, under Lamar
Homes, the court finds that this could constitute an occurrence because there was
no allegation that Plaintiff intentionally caused land subsidence and it was not
the natural and expected result that the neighbors' land would be damaged.
Therefore, this is another example of an occurrence causing property damage in
the Counterclaim.

Defendant argues that j(5) bars coverage because the problems that occurred with this project occurred while Plaintiff was "performing operations" on the project.  Plaintiff contends that j(5) does not apply because it is possible that property damage occurred after it stopped working on the project.

In <u>Mid-Continent Cas. Co. v. JHP Development, Inc.</u>, 557 F.3d 207, 213 (5th Cir. 2009), the court explained that "the use of the present tense 'are performing operations' in exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations."

Defendant points to the following statement in the counterclaim in support of its argument:

> In light of numerous problems such as those identified herein and the Project (at that time) already being over nine months behind schedule with completion nowhere in sight and $13.2 million over budget (at that time), [TPG] terminated the Construction Contract on April 27, 2015, pursuant to the Construction Contract's broad termination provision.[42]

Defendant contends that the inclusion of this language means that the property damage occurred by the time that TPG terminated the construction contract on April 27, 2015.  Elsewhere in the Counterclaim, in describing the property damage, TPG does not state exactly when the damage occurred.  For example, TPG alleges that due to structural problems caused by Plaintiff, "the floor of the

---

[42]   <u>See</u> 16-2, Ex. B to Pl.'s Mot. for Partial Summ. J., TPG's 1st Am. Countercl. p. 27.

structure began to sag and critical plumbing elements were cracked and damaged,"[43] but TPG does not define when the property damage occurred to the plumbing elements.

Plaintiff cites Mid-Continent in support of its argument that j(5) does not bar coverage.  557 F.3d 207.  In that case, construction of a condominium project was suspended when water leaked and damaged some of the units.  Id. at 210, 213.  The Fifth Circuit found that this exclusion did not bar coverage because "JHP was not actively engaged in construction activities at the time the water intrusion occurred" as "[c]onstruction had been suspended pending the purchase of the condominium units."  Id. at 213.  Here, unlike in Mid-Continent, the court does not know exactly when the property damage occurred.

In its response, Defendant cites Stone Creek Custom Homes, LP v. Mid-Continent Cas. Co., No. SA-14-CA-1115, 2015 WL 11705277 (W.D. Tex. July 7, 2015)(unpublished), in support of its argument that j(5) bars coverage.  Stone Creek found that j(5) applied because "the property damage was caused by Stone Creek's defective construction, which the Court agrees must have necessarily occurred during the performance of construction operations" and noted that there was no allegation that operations were suspended or not active when property damage occurred.

---

[43]    See id. p. 3.

Stone Creek's interpretation of j(5) is not persuasive in light of j(5)'s language that focuses on when *property damage* occurred, not when defective construction occurred. As stated in Mid-Continent, the court must look not to when the construction defect occurred but when the property damage itself occurred. Plaintiff argues that some damage could only have occurred after it was no longer working on that particular part of the project. Additionally, Stone Creek cites to Mid-Continent's interpretation of j(6) and applies that interpretation to j(5), conflating the meaning of these separate provisions; therefore, the court does not look to Stone Creek for guidance.

In this case, there is no clear language in the Counterclaim tying the property damage to a particular date. The Counterclaim does not define at what point in time this damage occurred while Plaintiff was still working on the project or after its contract with TPG was terminated. Defendant cites Admiral Ins. Co. v. Little Big Inch Pipeline Co., 523 F. Supp.2d 524 (W.D. Tex. 2007), a case wherein the court found that property damage, including the piling up of debris, was necessarily caused during the insured's work of excavation of gas lines. The court may not read additional facts into the underlying pleading or speculate on various scenarios, even in its search for potential coverage. See Gore Design Completions, Ltd. v. Hartford Fire Ins. Co., 538 F.3d 365, 369 (5th Cir. 2008)("Courts may not, however, (1) read facts

into the pleadings, (2) look outside the pleadings, or (3) imagine factual scenarios which might trigger coverage."). Additionally the court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent." Mid-Continent, 557 F.3d at 215 (quoting Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 666 (Tex. 1987)) While it may have been clear in Little Big Inch when damage occurred, in the present case, a fact question exists whether this occurred during Plaintiff's work on the property or once Plaintiff was no longer performing operations. Defendant, in asking the court to find that the property damage occurred prior to the termination of the contract between the parties, is requesting the court read into the complaint facts that are not alleged. Therefore, exclusion j(5) does not allow Defendant to escape the duty to defend.

**2. Exclusion j(6)**

Defendant argues that if the court finds that the allegations allege an "accident" or "occurrence," then coverage can be excluded under j(6), as TPG alleges that Plaintiff's work on the whole project was incorrectly performed. Plaintiff contends that this exclusion is not applicable because: (1) some of the property damage was not caused by defective work and (2) the contract between TPG and Plaintiff was terminated, so its work was complete

27

as of the date of termination.  Defendant argues that the products-completed operations hazard provision does not apply because the project is incomplete.

Plaintiff contends that some property damage, including the "allegedly defective work in the installation of structural elements [that] purportedly damaged plumbing lines that were otherwise non-defective" and the "allegedly defective installation of the lath [that] resulted in leaks after the otherwise non-defective plaster was laid," was defective work that caused damage to non-defective work, making j(6) not applicable.[44]

In Mid-Continent, the Fifth Circuit explained that "exclusion j(6) bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property."  557 F.3d at 215.  The court goes on further to explain that "the 'particular part' of the property must have been the subject of incorrectly performed work." Id.

The allegations in the Counterclaim suggest that some of Plaintiff's work that was non-defective was damaged by defective work.  For example, the Counterclaim alleges that due to defective

---

[44]     Doc. 16, Pl.'s Mot. for Partial Summ. J. p. 19.

structural work, "the floor of the structure began to sag and critical plumbing elements were damaged."[45]   The Counterclaim also alleges that the roof was installed defectively, which caused water leaks on the property.

There is still the question of whether the products-completed operations hazard is applicable in this case.  Defendant contends that the products-completed operations hazard exception does not apply because the project is not yet completed.  Plaintiff argues that the work is complete because its contract with TPG was terminated, citing <u>Mid-Continent</u>; alternatively, Plaintiff contends that the project was abandoned.

As explained above with regard to j(5), it is unclear when the property damage took place in this case.  However, the allegations in the Counterclaim clearly state that the project is still not complete, but that Plaintiff's role in the project was terminated on April 27, 2015.  The products-completed operations hazard considers work completed "[w]hen all of the work called for in your contract has been completed."[46]  Under this definition, the work was not completed as not everything called for in Plaintiff's contract was finished.  Termination of the contract between TPG and Plaintiff does not render the work on the project complete.

---

[45]     <u>Id.</u> p. 3.

[46]     <u>See</u> Doc. 16-3, Ex. C to Pl.'s Mot. for Partial Summ. J., Plaintiff's Ins. Policy pp. 20-21.

Therefore, the court finds the products-completed operations hazard inapplicable in this case.

Plaintiff also contends that its work was abandoned. This term is not defined in the Policy. While Texas courts have not appeared to answer this question regarding termination of a construction contract, other courts have addressed the meaning of "abandoned" in these types of policies. In <u>Cincinnati Ins. Co. v. Spectrum Development Corp.</u>, No. 2:11-CV-0015-CW, 2015 WL 730020, at *8 (D. Utah Feb. 19, 2015)(unpublished), the court explained that "[w]hile the term abandonment has some ambiguity with regards to whether it requires a unilateral decision by the insured or mutual action taken by both parties to the contract, several courts have held that it does not encompass the unilateral termination of an insured by the other party." (citing <u>Hubbell v. Carney Bros. Const.</u>, No. 05-CV-00026-CMA-KLM, 2013 WL 2029037 (D. Colo. May 14, 2013)(unpublished)(holding that no abandonment occurred when "the stipulated facts only support a finding that the [defendants] stopped working once Plaintiff's terminated their contract."); <u>Claredon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Ariz.</u>, 193 Cal.App.4th 1311, 1319 (2011)("[The insured's] work had not been . . . abandoned. Instead, [the insured] was terminated from the job before it completed work."). The court finds these cases persuasive and agrees with their interpretation that termination of the insured is not abandonment of the project. The products-

completed operations hazard does not apply in this case.  Exclusion j(6) does not bar coverage to the extent that the Counterclaim alleges that non-defective work was damaged by defective work.

### 3.  Fungus or Spore Exclusion

Defendant contends that the mold exclusion applies to bar coverage for the allegations related to mold in the underlying complaint.  Plaintiff does not directly challenge this, instead contending that this is only a small part of the allegations and does not preclude Defendant's duty to defend against other allegations.

In the Counterclaim, TPG alleges that the project became "infested with mold" which cost TPG at least one million dollars to remediate due to the fact that "[t]he Project's framing subcontractor . . . conducted its work so as to create a virtual 'greenhouse' for mold growth" and that "when mold problems arose, [Plaintiff] failed to take proper measures to address the mold problem and prevent future mold issues."[47]

The fungus or spore exclusion, added by endorsement to the Policy, clearly precludes coverage for these allegations, as mold is included in the definition of "fungus" in the endorsement.  See, e.g., Pierre v. Potomac Ins. Co. of Ill., 583 F. Supp.2d 806, 808 (N.D. Tex. 2008)("Mold is merely a type of fungus . . . As a result, the Court concludes that the policy excludes coverage for

_____

[47]     See id. pp. 3, 24.

31

any type of damages resulting from mold."). The endorsement states that the insurance does not apply to property damage caused by fungus or spores and that it does not cover any losses or expenses arising out of remediation. This exclusion bars coverage for any mold-related damage or clean up costs in this case. As Plaintiff points out though, this does not prevent Defendant from defending the lawsuit because if one claim is covered under the Policy, then there is a duty to defend the whole lawsuit. See St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.–Tex., 249 F.3d 389, 391 (5th Cir. 2001)("If coverage exists for any portion of a suit, the insurer must defend the insured in the entire suit.").

**4. Exclusion (m)**

In its motion for summary judgment, Defendant asserts that Exclusion (m) is also applicable, contending that "[t]o the extent that this Court construes the counterclaims to allege 'property damage' to 'impaired property' or to property that has not been physically injured, then exclusion (m) would apply to preclude any duty to defend."[48] Plaintiff responds that Defendant has not met its burden to demonstrate that this exclusion applies. Because coverage has been established in this case, the burden is on Defendant to demonstrate the applicability of exclusions. See Crownover v. Mid-Continent Cas. Co., 772 F.3d 197, 207 (5th Cir. 2014). Without any further explanation from Defendant about why

---

[48]   See Doc. 17, Def.'s Mot. for Summ. J. p. 21.

32

(m) applies other than a vague statement stating that it depends on how the court construes the Counterclaim, the court agrees that Defendant has failed to meet its burden to show that this exclusion bars coverage.

### 4.   Prompt Payment of Claims Act

Plaintiff moves for partial summary judgment on its claim under the Prompt Payment of Claims Act, asking the court to find that Defendant violated this statute by failing to defend. Plaintiff does not ask for a determination on the amount of damages, instead stating that it is "confident that an agreement on damages can be reached among the parties."[49]  Defendant argues that it has no duty to defend; alternatively, Defendant asserts that because Plaintiff has not provided evidence of damages, Plaintiff has not shown that Defendant breached its contract, and Plaintiff is not entitled to summary judgment on this claim.

The Prompt Payment of Claims Act provides that:

> if an insurer that is liable for a claim under an
> insurance policy is not in compliance with this
> subchapter, the insurer is liable to pay the holder of
> the policy or the beneficiary making the claim under the
> policy, in addition to the amount of the claim, interest
> on the amount of the claim at the rate of 18 percent a
> year as damages, together with reasonable and necessary
> attorney's fees.

---

[49]     See Doc. 16, Pl.'s Mot. for Partial Summ. J. p. 6.

Tex. Ins. Code § 542.060(a).  This statute has been applied "when an insurer wrongfully refuses to promptly pay a defense benefit owed to the insured."  Lamar Homes, 242 S.W.3d at 20.

The court has determined that Defendant owes Plaintiff a duty to defend.  Defendant's argument that Plaintiff is not entitled to summary judgment on its prompt payment claim due to its lack of evidence about damages is misplaced, however.  See Trammel Crow Residential Co. v. Virginia Sur. Co., Inc., 643 F. Supp.2d 844, 859-60 (N.D. Tex. 2008).  In Trammel Crow, the plaintiff did not provide specific evidence of its damages, instead reserving its right to make this factual determination at a later date.  Id. at 859.  The court held that the plaintiff "need not provide evidence of its specific defense costs at this time" and that "[t]he specific amount of damages, attorney's fees, and prejudgment interest to which [the plaintiff] is entitled remain to be determined at trial."  Id. at 859-60.  The court agrees with the approach taken by the court in Trammel Crow.  Here, as in that case, Plaintiff has not moved for summary judgment on the amount of damages and not provided specific evidence, but has reserved the right to informally resolve the issue with Defendant.  If the damages cannot be resolved, the damages will be determined at trial.  Summary judgment should be granted for Plaintiff on its claim under the Prompt Payment of Claims Act and damages will be determined at a later date.

34

### IV.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED IN PART AND DENIED IN PART** and Defendant's motion be **GRANTED IN PART AND DENIED IN PART**.  Defendant has a duty to defend Plaintiff in the underlying lawsuit.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 26th day of February, 2018.

_____
U.S. MAGISTRATE JUDGE

35